**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **TEXAS AUTO SAVE, LLC** | § | **Case No. 26-51089-alt** |
| | § | |
| **SYNERGY CAPITAL AUTO** | § | **Case No. 26-51088-alt** |
| **LENDING, LLC** | § | |
| | § | **Joint Administration Requested** |

<u>**SUBMISSION OF STATEMENT OF ALEX SINNO**</u>

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Texas Auto Save, LLC, and Synergy Capital Auto, LLC, the above-captioned debtors and debtors-in-possession (together, the "Debtors"), respectfully submits its Statement of Alex Sinno, attached hereto.

Dated: April 27, 2026

Respectfully Submitted,

THE SMEBERG LAW FIRM, PLLC

By:____/s/ *Ronald J. Smeberg*_____
RONALD J. SMEBERG
State Bar No. 24033967
4 Imperial Oaks
San Antonio, TX 78248
210-695-6684 (Tel)
210-598-7357 (Fax)
ron@smeberg.com
PROPOSED ATTORNEY FOR DEBTORS

My name is Alex Sinno.  I immigrated to the United States in 2005 from Dubai with my American Citizen mother.  I joined the United States Army as a lawful permanent resident in 2006 and naturalized during my time serving as a military intelligence non commissioned officer in 2007 while working with special operations during Operation Iraqi Freedom.  Upon honorable discharge from the Army in 2009, I started selling used cars with various car dealers including Nissan.  In 2012 I bought my first car dealership, which uses the "in-house financing" ("IHF") model.

The IHF model provides a very important service in the community by providing second and last chance financing to the automobile car market.  Under this model, Texas Auto Save, Inc. ("TAS")'s customers buy, finance, and pay for their cars through inhouse financing offered by my affiliated debtor company Synergy Capital Auto Lending, LLC ("Synergy").  TAS generates revenue from the down payment received on each vehicle sales plus the funds it receives when it sells the accounts and/or chattel paper to Synergy, which then generates a stream of revenue from the loan repayment and interest.  We currently have 25 employees and my wife and I work full time in the business.    The current owners of Synergy and TAS are myself at 51% and Vasireddy Sirdhar at 49%.

I used the skills I learned in the Army to create a very successful car dealership, which by any reasonable definition is still successful today.  Currently, my dealership sells about 50 cars per month at an average total price of $15,550 per car.  There are currently about 1000 car contracts as receivables to Synergy with a balance of about $11.5 million.  Of these contracts, there are about 42 contracts that are more than 30 days late with balances of about $501,000.  Of these 42 contracts, historically, about 2 cars will result in the vehicle not being successfully repossessed or total loss after repossession.  30 of these cars will on average be repossessed with 10 coming back into terms.  Of the 30 cars, 25 cars will be reconditioned and resold and 5 will be sold at auction for typically $2000 to $3000.[1]

We just finished cleaning out our inventory to remove cars that will not be able to be reconditioned that have been sitting in our lots far longer than normal.  Therefore, we currently have (or recently had) 103 cars in auction and we anticipate receiving $1500 on average per car auctioned (total $154,000), which is lower than  the average based on their condition.  Depending on when this bankruptcy case is filed, many of the cars may have already been sold.

We typically have 20-40 cars in reconditioning with average value of $7000.  Typically we have 10-20  cars on lots with retail value of $15,400[2] per car.  The number of cars on lots

---

[1] As discussed later, I have recently sent many vehicles to auction that had been sitting on our lot and were in worse shape that typical and they likely will only bring about $1500 per vehicle.

[2] The total average sale prices is approximately $15,550 per car because the sale price includes a $150 fee.

varies greatly because over a weekend we can sell many cars depleting inventory that may take several days or even a week to replenish with reconditioned cars or cars purchased wholesale or at auction.

In 2019 we started buying real estate for use in this business. First, we purchased so that I would not have to rent the land for my lots and IHF business and then second as a developer. Our first lender was First Command Bank when we purchased the lots located 9410 Old Tezel Road and 8504 Old Tezel Road, San Antonio, Texas 78254. Then, we switched to Frost Bank when we purchased the land located at 12258 N. IH 35, San Antonio, Texas 78223. These loans and the real estate were all held in the name of SAR American Properties, LLC, which is the landlord to Synergy and TAS. We also purchased an adjacent lot to the IH 35 land in 2019 at 6622 Randolph Blvd, which is currently financed by Jefferson bank and titled under TAS. The loan balance with Jefferson Bank is $450,942.00.

In 2020, we opened a car lot in Houston, Texas under a company named A & F Holdings, LLC. When we opened this store, Frost Bank gave us a $900,000 credit and we paid it off within the next 3 years. Frost then gave A & F Holdings, LLC a new $500,000 credit line and told me we would have a longer, five year period, and we made payments of $6500 monthly. As early as August of 2024, Frost attempted to default SAR because of non payment issues. The issues were ultimately resolved in Fall 2025 and we are in the process of selling a large section of the SAR land (not needed for current operations of TAS or Synergy) to retire that debt. For now, Synergy and TAS pays $30,000 monthly to SAR for use of part of the SAR land in the TAS and Synergy operations.

In addition to the Frost Bank loans, SAR used its property to collateralize Synergy and TAS' debt with Westlake Capital Financial ("Westlake"). Up until 2024, Westlake provided Synergy with 100% of the capital to fund vehicle purchase contracts. The Westlake debt is approximately $10.3 million and is collateralized with all of the Synergy receivables, all of the vehicle inventory, and second liens on the SAR and TAS real estate..

The Westlake collateral position and relationship is very complicated. Prior to Westlake, TAS and Synergy were funded by PlainsCapital Bank. Westlake worked very hard to convince us to move to them in 2023 and we agreed to move to Westlake because they increased our credit line to $16,000,000. At this time, the business was booming and expanding. Even though I later learned the market was souring in the IHF market in 2024, our business continued to expand largely because we controlled all aspects of the business where other companies had to pay third parties for areas such as collection and repossession.

In first quarter of 2024, we sold 391 cars.  We were doing so well, I had no idea the market was sour for other dealers.  I did not understand why at the time, but in April of 2024, Westlake cut us off from our line of credit because of what I now understand was the IHF downturn.  Apparently, they wanted to reduce their risk because of what everyone else was going through.  Cutting us off from our line created a major problem and ultimately the problem we are in today.  In March 2024, we  submitted a draw request to Westlake for $340,000 but Westlake only funded $250,000 and then stopped the credit line entirely.  We then had to use our cash to pay our payables but and did not have the case to purchase more cars.  Westlake insisted on larger principal paydowns such that our debt to Westlake reduced from more than $13 million down to below $11 million.  But without purchasing more cars to sell, we solely were selling repossessed cars and were not replenishing  them.  Westlake further forced problems on us by using is own related entity to put my personal name on the "kick out" book, which is a formal way that lenders in this business black list persons from buying cars at auctions.  By doing this, it greatly reduced our ability to purchase cars not only from our purchasing at auction but also caused us to lose our floorplan.  They did this because A and F had problems but Texas Auto Save was still operating correctly..

Without the capital to keep funding new sales, we had no choice but to change our model to focusing on reconditioning repossessed cars and buying fewer and fewer auction cars.  Hence,  Westlake caused the problem they so feared.  This is the reason we only sell 50 cars per month now.   If we had our full line of credit we would easily sell 70 cars monthly.

Through 2025 we continued to work on our systems.  By July 2025 our  debt was below $11 million while our receivables were down to $17,248,449.  Bbut not all receivables are created equal.   In the IHF, industry, at some point car contracts must get charged off.   A charge off is usually calculated as the amount remaining on the contract minus what is received by the finance company (Synergy) from the sales company (TAS) or from an auction if the car is sold at auction.  There are a lot of variables.  First, how long we wait after the last payment to charge off a car is a major variable.  I have learned recently that industry standard is about 120 days from the date of last payment.  We generally were not charging off cars until the repossessed car was either sold at auction or sold to a new buyer, which was completely understood by Westlake and reflected in our records, which they analyzed regularly.  To be clear the last date of payment was in our system and Westlake is not just a bank.  Westlake has its own in-house  collection division that does what our IHF payment division does (at least in regard to  making phone calls and ordering repossessions) and we have history of them being in our data almost weekly and some times daily.   Hence, Westlake saw exactly how long we were holding cars.   I point this out

because I recently received communications from my representative acting like he had no idea that our charge offs had been aging.

Paul McClintock has helped us change our charge off process so that we have now removed bad inventory (by sending to the auction) and charging off old accounts.   We have also implemented a new system where at 120 days of no payment, we charge off the car.   This is important because now we (the Court, Westlake, other creditors) can effectively tell month to month how we are actually performing.   The process is fairly simple.   We can tell how many new notes we have generated each month, how many cars have charged off under the strict 120 day rule (which reduces our total notes outstanding), how much inventory we have on our lots, and how much inventory we have in reconditioning (or heading to auction).   Our average car total sale price is $15,550 and the average value of our cars in the various stages of reconditioning is $7000.   Therefore, if I wanted to know the total collateral base between Synergy and TAS (excluding real estate) at any time we would take the following formula:

Lot Cars Value + Recondition Cars Value + Auction Car Values + Outstanding Notes + Plus Cash on Hand.

The fair market value of the cars in these various stages varies  depending on how you decide to sell the cars and manage the notes.   Cars "on the lots" are fully functional and if they are sold on a lot in an IHF sales process, they will sell on average for about $15,550 per car.  If they are sold to a traditional buyer for cash or normal  financing, the same car would likely sell for substantially less, $8000 to $10,000.   The cars that are in reconditioning could only be sold at auction or wholesale at deep discount and likely would sell for $2000 to $4000 per car.  But the biggest hit would come if the notes are sold without car service.

People who use IHF are basically on their last chance.   They need the cars but have such poor credit, there are few options to purchase cars.  If the car stops running, they will stop paying close to 100% of the time.   They don't care if their credit is going to be damaged.   They need  a car and can't continue to pay for a car that isn't running or can't be fixed relatively inexpensively.   Hence, if a car breaks down and the customer brings the car to us, most of the time we fix it for free or at substantially reduced rate.  The key is not only servicing but servicing fast.   We have effectively our own tow trucks through affiliated entity 210 Action.  If a customer calls us with a problem we immediately jump on the issue.  If we don't, many times within a day they go buy another IHF car elsewhere.  Hence, we act fast to resolve the customer's issues.

For example, worse case, a customer's engine is blown,it's going to cost us $3000 to fix it, and the owner still owes $10,000 in principal.  The payment is likely about $500 per month

principal and interest.  $3000 is basically 6 monthly payments.  If the customer has been a good customer and regularly paying his or her bill, it makes sense for us to pay the $3000 for the new engine.

If the notes are just sold to a collector, a collector is  not likely going to pay more than 50 cents to the dollar because they also know that once the cars break, the people are not going to keep paying.  And a collector is never going to pay the $3000 to fix the car, no matter how good the customer pays.   So the collector is just betting that on average more than 50% of the loans will be paid before the cars stop running.   That is bad for everyone including the poor customer who now doesn't have a car and many not have a down payment to buy another IHF car.   A similar issue occurs if the location where a car is sold closes down even if the IHF company is still operating.   Car owners often assume that if the location where they typically made their payments closes, then they no longer have to make the payments.

Westlake has told us numerous times they wanted to take over the collections.  But we know that if they take over the collections, then at best they likely collect $6 million leaving a huge deficiency that causes a loss for pretty much everyone including Westlake.   But banks, in my opinion, do not think that far.  In my opinion, they just see numbers.  They don't see employes and customers and the problems caused by just trying to convert a note to cash.

The obvious question and elephant in the room is if in 2024 the receivable base dropped substantially when the focus became paying off the Westlake debt to the point where we now have a loan to value ratio of around 85%, why is it going to be better now?

The answer is that we now have balance and repaired systems.  First, we replaced our director of operations with Joaquin Bermudez.  Joaquin has substantial experience in the IHF industry and has help us revamp our systems, remove bad inventory, and understands our data more properly.   Second, we have changed our systems from the rapid expansion system that was operating in early 2024.   Our operation was set up in early 2024 to rapidly expand, which caused large capital expenditures for that purpose.  Now we are more focused on maintaining current business, reconditioning and reselling cars, and improving collections through better customer relations.

Third, we are cutting costs loses through eliminating needless litigation and looking to term out the Westlake loan.  Our relationship with Westlake turned into basically an MCA relationship.  We paid out about $350,000 in principal just in the first three months of 2026 and paid out over $500,000 in legal expense in 2025 largely related to dealing with Westlake.  It's not possible to sustain an IHF business with that amount of non operational

loss.  With all the changes we have made, reducing legal expenses, and paying a reasonable principal paydown rate, we are now operationally stable and profitable.

Finally, it is also important to discuss what happened between us and Westlake later in 2025.   In late Spring/Summer 2005, Texas made changes in the law regarding how and when titles needed to be held by the dealer.   We requested that Westlake send all titles to us and Westlake complied.  A short time later, Westlake demanded the titles back and we were in a dispute with Westlake over lending ratio.   Looking at the same data, Westlake and I both viewed this ratio to be approximately 65%.  We agreed to return the titles and Westlake agreed to give us until October 2026 to refinance the debt.  We agreed to this because we believed the data suggested we could refinance the debt.  Otherwise, I would just be "kicking the can" down a very short road on a very big debt.   However, the assumption of the lending ratio was simply not correct.  I cannot tell you as I sit here today if Westlake really understood the impossibility, but they were looking at the same data.  By industry standards I now understand it would have been impossible to refinance this debt by October 2026 or maintain the ratio they required.

It's important to note that Westlake almost always had 100% access to our data.[3]  They could see what we sold, how much we sold, who we sold it to, when the customers were paying, collection notes, and they could see the last payment made by each customer.  This issue is very important because whether we were in good standing with Westlake largely depended on the data and they constantly changed how the data was interpreted and how they wanted us to manage the data.  For example, our policy was to allow up to 3 payment deferments that allowed a customer to pay late.   However, our prior director of operations, working with his counter part at Westlake, allowed additional deferments  even though the data showed, and continued to show accounts were long over due.  This process was ultimately one of the reasons we terminated our director of operations and brought in Joaquine Bermudez.   While I am not certain, it appears to be the same reason Westlake terminated its relationship with the director's Westlake counterpart.

These issues were  really brought to light in late February 2026.  In November 2025, I changed accountants to HHM CPAs, which is one of the country's largest accounting firms in the auto IHF dealer industry.  HHM told us that they were correcting our methodology because we had far too many accounts over 120 days that were not charged off.   The reality is that because of the charge off timing discussed previously, our actual lending ratio in July of 2025 was much higher than believed.   It's not that our ratio tanked between July and now.  It's that it was already far too high and with all our corrections, it is now very apparent.  I believe Westlake understood this but because they wanted the titles back, they

---

[3] There was a very short period of time in which we locked them out.

"agreed" this was the number knowing that the number was much higher and it would be completely impossible for us to obtain take out financing.  That is why we are here in bankruptcy.  Our business is now stabilized, profitable and able to term out the entire Westlake debt over an 8 year period but a take out loan at this time is likely not possible.

We plan to spend very little time in bankruptcy.  However, during the bankruptcy we need use of cash collateral to purchase cars, pay employees, pay taxes, pay insurance and other operating expenses.  We also need to maintain our service department so we can maintain customer cars as discussed earlier to maintain the value of our portfolio.  The projected expenses for the first 12 weeks of the bankruptcy case are outlined in Exhibits A1 and A2 of the Joint Motion For Use of Cash Collateral, which was prepared by our financial consultant Paul McClintock.

As of April 25, 2026, we have outstanding payroll and sales commissions of $32,486 and it is critical that we make payroll on May 1, 2026.  The outstanding payroll is reflected in Exhibit A to the Texas Auto Save Motion to Pay Prepetition Employee wages.   Up until this bankruptcy filing, all of the employees that performed work for both TAS and Synergy were under the TAS payroll.  Effective the first full payroll occurring during the bankruptcy, we are splitting the payroll so that employees are being paid from the appropriate work  center.

In addition to the Westlake and Jefferson Bank debts, TAS owes approximately $300,000 to $350,000 to the Texas Comptroller for taxes accrued several years ago.  TAS also owes a secured debt to the SBA in the amount of  $150,000, general unsecured non insider debt of approximately $325,000, and affiliate unsecured debt of approximately $1.2 million.   There are also potentially 3 Merchant Cash Advance ("MCA") loans owed by Synergy and TAS with 2 out of three possibly secured.  The total of these loans is approximately $1.15 million.  Which MCA loans are actually secured is unknown at this time because two of them had active UCC filings but were filed anonymously.   The most senior blanket debt appears to be the SBA loan and the second most senior blanket debt appears to be Westlake's loan.  The security position of the MCA lenders is tenuous at best.  Finally, Synergy has a debt to Creditor's Captive Formation Corporation[4]("CCFC"), which is the company that provides collision insurance to protect our interest in funded car purchases, and Bexar County may be owed a small secured debt related to the building at 6622 Randolph and inventory.

Alex Sinno, Manager Synergy Capital Auto Lending, LLC and Texas Auto Save, LLC

---

[4] While technically the debt to CCFC is close to $400,000, because the Debtors have been resolving their own claims, the actual amount owed to CCFC is likely closer to $100,000.